EGGLESTON *vs.* THE NEW YORK AND HARLEM RAIL ROAD COMPANY.

A parol license to enter into the possession of land is no defense to an action by the owner of the land to recover the possession.

Such a license is not irrevocable, so as to bar the grantor, or his heirs, from recovering the possession. It will be revoked by a conveyance of the land to another person, or by the death of the grantor.

A mere agreement to sell does not of itself import a license to enter into possession.

E., by an instrument under seal, executed by him, in June, 1849, agreed or promised, in case the defendants' road should be located across his farm, to convey to them whatever land they required, on receiving the price of six-

Eggleston *v.* New York and Harlem R. R. Co.

teen dollars per acre, in their bonds. In the fall or winter of 1850, the defendants, with the knowledge of E. and without any objection on his part, went into possession, and proceeded to build their road, and had ever since occupied and used the land as a part of their track. In May, 1851, E. conveyed the land to the plaintiff, who disavowed the agreement, and refused to give a deed. E. died in 1853. *Held,* 1. That whatever *license* to enter there was, rested wholly in parol. That it was not contained in, nor derivable from, the instrument executed by E., but must be inferred from the entry and subsequent possession by the defendants, with the knowledge of E. and without objection on his part.

2. That such license was not irrevocable, but would have been revoked by the death of E., and was revoked by the conveyance from E. to the plaintiff, in May, 1851; and that it was no defense to an action brought by the plaintiff to recover possession of the land.

3. That the doctrine of *estoppel* was not applicable to the case.

APPEAL from a judgment entered upon the report of a referee. The action was brought to recover the possession of a strip of land four rods in width and ninety rods in length, running through the plaintiff's farm, which the defendants had fenced off, and upon which they had constructed their rail road. The answer denied that the plaintiff had any title to the premises, or had ever been in possession thereof; and the defendants alleged that their rail road was laid out and located through the said farm or tract of land on or about the 25th day of June, 1849, with the license and consent of Nicholas Eggleston, the then owner of the said farm or tract of land described in the complaint, and that the defendants had ever since held and occupied the same; and that the plaintiff took possession of said farm with full knowledge thereof.

On the trial before the referee, the plaintiff put in evidence a deed from Nicholas Eggleston and wife to him, dated May 8, 1851, recorded October 21, 1853. It was admitted that this deed included the premises in question. It was also admitted that the defendants took possession of the premises, and commenced building their rail road thereon, in the fall or winter of 1850, and have ever since held possession of the same, as part of the track of their rail road. It was admit-

ted that Nicholas Eggleston had been in possession of the premises for upwards of thirty years, prior to the entry of the defendants. The plaintiff here rested, and the defendants read in evidence, the execution being admitted, the following paper writing under seal, dated June 25th, 1849, to the introduction of which the plaintiff objected, and the same was received subject to the objection :

"In case the New York and Harlem Rail Road Company shall locate their road across the farm or land owned by me, in the town of North East, in the county of Dutchess, I agree, in consideration of the benefit to be derived from said road, and of one dollar to me paid, to convey to said company at any time within the period allowed by their charter for the completion of said road, by a good and sufficient deed, so much of my land over which said road shall be located, or which said company shall require for the use of said rail road, upon said company paying or tendering to me the sum of sixteen dollars per acre for all land so taken, to be paid in bonds bearing seven per cent interest, payable semi-annually, redeemable in ten years. It is understood that timber is reserved. The said Nicholas Eggleston to make and forever maintain good and sufficient fences on both sides of said road, when necessary, the said company paying for the same at the rate of one dollar and fifty cents per rod, in their bonds, bearing seven per cent interest, payable as above. The said company agreeing to make and maintain a good and sufficient crossing place over said rail road on my said land, and ditches, where necessary, to carry off the water, so as not materially to injure my remaining land.

In witness whereof, I have hereunto set my hand and seal this twenty-fifth day of June, 1849.

NICHOLAS EGGLESTON." [L. S.]

It was admitted that Nicholas Eggleston died in October, 1853, and that this action was commenced in March, 1856. The evidence being closed, the defendants moved that the complaint be dismissed on the following grounds :

Eggleston *v.* New York and Harlem R. R. Co.

*First.* An executed license involving expenditure is regarded as an executed agreement for a valuable consideration. A right under a license is commensurate with the thing of which the license is an accessory. Such a license is of unlimited duration.

*Second.* Where an owner transfers title, after the construction of a rail road, the claim for damages is gone.

*Third.* No person can claim damages for the construction of a rail road, who was not owner at the time of location.

*Fourth.* The defendants having entered under a written agreement with the owner, and constructed their road, ejectment cannot be maintained.

*Fifth.* A license coupled with an interest is irrevocable.

*Sixth.* The evidence shows that the plaintiff purchased, after the road was constructed, for a nominal consideration, and whilst the defendants were in possession under a written agreement. He refuses to recognize their purchase from his father, or to execute the agreement. He cannot therefore maintain this action.

The referee overruled the motion for a nonsuit, and the defendants excepted.

From the judgment entered upon the report of the referee the defendants appealed.

*C. W. Sandford,* for the appellants.

*W. S. Eno,* for the respondent.

*By the Court,* EMOTT, J. This is an action to recover the possession of land. The plaintiff has also claimed damages for withholding the possession, but as he has not recovered any damages, we may lay this part of the case out of the questions now to be considered. The defendants answered, first, denying the plaintiff's title, and denying an unlawful withholding, which is equivalent merely to a denial of any withholding of the possession. Upon so much of the issue

between the parties, the plaintiff was entitled to succeed when he had proved, as he did, his own title to the premises, and their possession by the defendants in hostility to that title.

There was, however, another defense set up in the residue of the answer, and it remains to consider that defense, and the evidence to sustain it, given at the trial. This part of the answer is to the effect, that the rail road of the defendants was located through the plaintiff's farm in June, 1849, with the license and consent of Nicholas Eggleston, then the owner thereof, and that the defendants have ever since occupied the same, and that the plaintiff took possession of the farm with knowledge thereof. The evidence showed that in June, 1849, Nicholas Eggleston signed a paper, which was introduced by the defendants. By this instrument, which was under seal, but was executed by him only, and not by the defendants, he agreed or promised, in case the defendants' road should be located across his farm, to convey to them at any time within the period allowed by their charter for the completion of their road, whatever land the company required, on receiving the price of sixteen dollars per acre in their bonds. The paper also contained stipulations reserving timber; and providing that the owner of the land should make and maintain fences, and that the company should make and keep crossings. It was proved at the trial that the defendants took possession of the premises described in the complaint, in the autumn or winter of 1850, and proceeded to build their road, and have ever since occupied and used the land as part of their track. When Nicholas Eggleston conveyed the land to the present plaintiff, his son, the road was built and the cars running. The plaintiff, after he had acquired the title, was applied to for a conveyance under the paper signed by his father, but he declined to execute a deed, or recognize the instrument of June, 1849, as a valid contract for a sale.

It is to be observed, that the answer does not raise the

question whether the instrument executed by Nicholas Eggleston was a sufficient agreement to sell, or could be enforced as such in equity, and I do not find it necessary to consider that question. There is no allegation of title in the defendants, either legal or equitable, or of a right to demand a conveyance or title under this or any other agreement to sell, and no prayer for the performance of any such agreement. The plea is a plea of a license to take and occupy and use the premises in question, given by the plaintiff's grantor, with an averment that the plaintiff took title with knowledge of such license, and of a consequent occupation. The argument for the defendants is, that this license is irrevocable.

The referee has not stated whether he was satisfied, upon this evidence, that the defendants actually entered under a license. A mere agreement to sell does not of itself import a license to enter into possession, and it will be found, upon a reference to the cases in which the rights of parties who have gone into possession of lands under contracts to purchase have been examined, that they have had possession either by the stipulations of the contract, or by the express consent of the vendor. (*See* 9 *John.* 35; *Id.* 331; 6 *Barb.* 186; 1 *B. & C.* 448; 13 *East,* 210.) In the present case, the utmost which can be claimed for the defendants is, that they, holding an agreement by Nicholas Eggleston to sell to them, went into possession with his knowledge and without objection on his part. The defendants' entry was in the fall or winter of 1850, and in May, 1851, Nicholas Eggleston conveyed to the plaintiff, who immediately disavowed the alleged agreement, and refused to give a deed. Nicholas Eggleston died in October, 1853, and this action was commenced in March, 1856.

When a purchaser goes into possession under his contract, if the contract is broken and terminated, he becomes a tenant at will to the vendor. To this effect are several of the cases already cited, and others will be found collected in 1 *Sugd. on Vendors,* 264, *note q.* But if this relation ex-

isted between Nicholas Eggleston and the defendants, it will not avail as a defense in the present action, for various reasons. There are several facts proved which would determine the will, and put an end to such an estate, if one existed. *Blackstone* (2 *Com.* 146) says: "Besides the express determination of the lessor's will by declaring that the lessee shall hold no longer, the exertion of any act of ownership by the lessor, as making a feoffment, or a lease for years to commence immediately, puts an end to or determines the estate at will." So *Coke upon Littleton* (*p.* 556) recognizes an express and an implied ouster to put an end to the will. The principle is, that any act of ownership exercised by the landlord, inconsistent with the estate, operates to determine it. (*Cruise's Dig.* 245. *Crabb on Real Property*, §§ 1549, 155.) In this case the absolute deed by Nicholas Eggleston to the plaintiff, of which the defendants had notice, was a determination of their estate, if they were tenants at will, since it was obviously inconsistent with such an estate. It is true there are some expressions in the books which seem to require a formal notice to quit, before ejectment will lie, against a tenant at will, after the determination of his estate. (*See* 8 *Cowen*, 15; 17 *John.* 4; 4 *Cowen*, 349.) But there are insuperable difficulties in the way of the defendants invoking this doctrine, in their case. To bring themselves within such a rule, they must concede that their contract is at an end, and that they have no estate in the premises, except at the will of the plaintiff, or of his grantor. For if they are equitably the owners, and entitled to a conveyance as well as to possession, different principles apply, and then they cannot defend merely on the ground of the want of a formal notice to quit. Besides, they have not pleaded that they are tenants at will, nor alleged the facts out of which such an estate would arise. The answer does not allege an agreement to sell and a possession delivered under it, which had never been rightfully or sufficiently determined, but merely a license to

enter and occupy. And the facts which are proved are to be considered as evidence given to establish such a license.

Whatever license there was, rested wholly in parol. It is not contained in nor derivable from the instrument of June, 1849, admitting that this was an agreement to sell. It must be inferred from the entry and subsequent possession by the defendants, with the knowledge of the plaintiff's grantor, and without objection on his part. As a mere license, no doubt this would be a bar to any action for damages during the period for which the occupation continued, and unless or until the plaintiff proved that the license was revoked. The case of *Miller* v. *The Auburn and Syracuse R. R.* (6 *Hill,* 61) was decided upon this principle. It was an action on the case for damages, for the erection of an embankment by the defendants, upon a street in Auburn, lying between and adjoining lands of the plaintiff. The defendants offered at the trial to prove a parol license, which was rejected. The court granted a new trial on account of this ruling; holding that such a license as a personal authority would be a bar to an action for damages, as long as it continued unrevoked. Judge Cowen, in delivering the opinion, strongly disapproves of the doctrine of irrevocable license, which is now pressed upon us. It is true that the case did not call for a decision of that question, and it is not therefore an authority in point upon the precise issue in the present action.

But as a defense to an action to recover the possession of the land, and not damages for acts done upon it, such a license as is claimed in this case is not a defense, unless we are to hold that it is irrevocable. As a mere license, it would have been revoked by the death of Nicholas Eggleston, and indeed by his previous conveyance to the plaintiff. It is therefore incumbent upon the defendants to establish that the license given by Nicholas Eggleston to them, to enter and locate their road upon his land, was irrevocable, so as forever to bar him or his heirs from recovering its possession. This is in effect, as I understand it, the claim made by the defend-

ants, and I understand it to be made and urged upon grounds which are entirely independent of the question of the validity of the instrument of June 25th, 1849, as a contract. The ground upon which the doctrine put forward by the defendants is supposed to rest is, that such a license, when executed, is an irrevocable agreement, because the purpose for which the land is required is perpetual, because its use has involved expenditures, and because it is coupled with an interest, as conferring a right to an exclusive use and occupation of the soil. These reasons are obviously just as applicable to a case where there is no claim of any contract to sell, but a mere executed license standing alone. They are derived from the character of the license or consent, and the nature of the use or enjoyment of the property of the licensor, which it is supposed to import or confer.

It is true that the purpose for which the land is required is perpetual. But this only brings the defendants to the necessity of insisting that a parol license to them to enter upon land, and construct a railway, is equivalent to a conveyance in fee of the land. It is merely stating their propositions in other terms. In most of the cases in which it has been attempted to maintain a similar doctrine, the right which was claimed under the license was an easement or incorporeal right, which, according to the phraseology of the books, lay in grant at the common law. The general doctrine is well discussed and applied to this class of cases in the admirable opinion of Baron Alderson in *Wood* v. *Leadbetter,* (13 *M. & W.* 838.) He says, at p. 845: "A mere license is revocable, but that which is called a license is often something more than a license; it often comprises or is connected with a grant, and then the party who has given it cannot, in general, revoke it." He adds: "A license by parol, coupled with a grant, is as irrevocable as a license by deed, provided only that the grant is of a nature capable of being made by parol. But where there is a license by parol, coupled with a parol grant or pretended grant of something which is incapable of being granted

otherwise than by deed, then the license is a mere license; it is not an incident to a valid grant, and is therefore revocable." Since the revision of the statutes of this state in 1830, by which all subsequent conveyances of lands were declared to be grants, this reasoning is applicable in terms, in our law, to corporeal as well as incorporeal hereditaments. The argument for the irrevocability of parol licenses in such cases as the present, overlooks the essential nature of a license and would convert it into a grant, and then make such a grant effectual without deed or writing, notwithstanding the statute of frauds. Ld. Ch. J. Vaughan, in his judgment in *Thomas* v. *Sorell,* (*Vaugh. Rep.* 351,) says: "A dispensation or license properly passeth no interest, nor alters or transfers property in any thing, but only makes an action lawful, which without it had been unlawful." He then gives some illustrations, and cites cases where the consequence of a license may be to change property, as a license to eat meat, to take and burn wood, to kill and carry away game. In such cases the license is more than a license; it is accompanied by a grant, and the property upon which it operates is of a nature to pass by a parol grant. A tacit permission to build a railway over a man's land may be a license, as to the entry or the damages resulting, as long as the license is unrevoked, but it can be no more effectual to pass the title to the land than an express grant or gift by parol would be; and the latter would plainly be void by the statute of frauds. Such a permission, however, is not even equivalent to a parol grant of the land, because it does not in terms import such a grant, nor is a change of the property an inevitable consequence, if it is to have any effect, as is the case in the instances cited by Vaughan. Such a permission may be given, and it may be acted upon and followed by an occupation of the premises, with the knowledge, and with reference to the fact, of the power of the company to acquire the lands under their charter. Or it may be given antecedent to the completion of a treaty or the performance of an agreement to sell, which may

turn out to be invalid, or may be broken off. It does not necessarily and by its terms include a change of the property or of the title. It may, under certain circumstances, be very inconvenient to the licensee or purchaser that it should not, but being merely a tacit consent to an entry, it can have a full, certain and legal effect without implying such consequences. These considerations apply to the argument from the interest with which the license is said to be coupled, as well as to that from the purpose of the defendants' entry and occupation. The argument assumes that an interest is created in the defendants; that is, that the license contains or carries with it a grant of an interest. This is the very point in dispute. There is no such grant inherent in a license of whatever nature; indeed it is never strictly any part of the license. Such a grant and a license may be intended to be contemporaneous, and the latter may become irrevocable, because the former is so by its nature or its terms. A grant is thus sometimes said to be accessory to a license, but that can never be where the transaction rests wholly in parol, and the property is of a nature which cannot pass without deed; for a conveyance of such property can never be accessory to a verbal license to use it.

The doctrine of estoppel is sometimes invoked in such cases. It has however no just application to the present issue. A man may be estopped from asserting his title, where he has made statements upon the faith of which others have acted, or has acquiesced in acts by others, involving an assertion of a title hostile to his own, and which they would not have committed but for his apparent consent. In an action at law a party may be concluded by an estoppel in pais from denying the existence of facts which he has thus asserted or admitted, and in that way his legal title may be barred. In a court of equity he may be restrained from enforcing a legal title, where circumstances exist which would make it inequitable and fraudulent for him to do so. But there is no appeal here to the equitable jurisdiction of the court, and no

Eggleston *v.* New York and Harlem R. R. Co.

opportunity for invoking an equitable estoppel. In reference to an estoppel in pais, it would be sufficient to say that it could not be permitted to have the effect of dispensing with the requirements of a positive statute, even when the question arises between the parties to the transaction themselves. If the intentions of the parties, followed by action upon the faith of such intentions, were sufficient to sustain agreements and sales, we might as well have no statutes requiring written evidence of such transactions. We can hardly say that when one man said to another, you may take and keep this land forever, this, if followed by delivery of possession, would be as effectual as a deed. Still less can we hold that a simple silent acquiescence in an entry upon and the use of lands will have such consequences. Parties must be held to act and agree with reference to the law of the land, and cannot be allowed to dispense with it at pleasure. But there is no foundation for an estoppel in the facts of the present case. The license or consent to enter, under which the defendants claim to have acted, could have full effect as a license merely, and need not imply a relinquishment of title. That it did not, is evident from the instrument to which they procured the signature of Nicholas Eggleston in June, 1849, and under which no doubt they proceeded, expecting it would be pursued or performed, rather than in reliance upon mere verbal assent or consent. As I have already said, the question of the validity of this paper as a contract, or of the rights of the defendants under it as such, are not presented by the pleadings. Supposing it to be invalid and inoperative as an agreement, could the plaintiff or his grantor be said to have lost his title, or even to be estopped from asserting it, because the defendants took possession supposing it to be valid, and without objection by the plaintiff's grantor. There is another feature in the case which deprives the argument for an estoppel of much of its force, and does away with an apparent hardship which might be urged. The defendants are vested with the paramount right of eminent domain which

belongs to the state. They can compel the surrender of these lands at any time by making due compensation for them; and this fact must be presumed to have been known to both parties. There is therefore even less reason than in ordinary cases, for inferring that such a license as this was intended as a grant. The question is not whether the defendants shall absolutely lose this land, with their erections and expenditures, but whether they shall be obliged to submit to a valuation of the land, or shall retain it at the price fixed in the paper signed by Mr. Eggleston.

In the case of *Miller* v. *The Auburn and Syracuse R. R. Co.*, (6 *Hill*, 61,) to which allusion has already been made, Judge Cowen very pointedly dissents from the doctrine of executed and irrevocable licenses, as applied to cases where they are to be substituted for deeds. He expressly says that the owner of lands is incapable of granting by parol such a right as was there claimed by the railway company. If that remark be true, it is decisive of the present case. In the previous case of *Mumford* v. *Whitney*, (15 *Wend.* 380,) the same doctrine was applied by Ch. J. Savage, where it was in point and decisive, and until that case is overruled, the contrary rule can hardly be admitted into the jurisprudence of this state. "To decide," said the chief justice in that case, "that a right to a permanent occupation of the plaintiff's land may be acquired by parol, and by calling the agreement a license, would be in effect a repeal of the statute."

We were referred to two recent cases in the English courts, in support of the defendants' claim. One of them is *Doe* v. *The North Staffordshire Railway Co.*, (4 *Eng. L. and Eq.* 216.) That was a case where a railway company having compulsory powers by charter to take lands within a certain time, located their road over the lands of the plaintiff's lessor, entered and took some initiatory steps towards acquiring a complete title. Then however they paused, and no farther proceedings were had to clothe them with the legal title, or to ascertain the compensation to be made to the land owner. The period

Eggleston *v.* New York and Harlem R. R. Co.

during which the statute allowed them to institute compulsory proceedings elapsed, and then the land owner brought ejectment. The court held that the proceedings having in effect been commenced within the time limited, might be completed afterwards, and the company still acquire the legal estate. They held, also, that the company had gone as far as they were bound to go, and that what remained to be done, to ascertain the compensation and value of the lands, was for the land owner to initiate. He could not therefore take advantage of his own neglect. He could not eject the company, but must proceed for his compensation under the act. It is plain that there is nothing in this case to sustain the defense in the present action.

The other case is *Doe* v. *The Leeds and Bradford Railway Co.*, (6 *Eng. Law and Eq.* 283.) In that case the defendants, having located their road over the lands in question, entered upon them under an agreement by which the lessor of the plaintiff consented to the entry, and to refer the question of the amount of compensation for his land to an arbitrator. The arbitrator made his award, and then the owner of the land raised a question as to the terms of the conveyance to the defendants, and finally gave them notice to quit and brought ejectment. At the trial the plaintiff was nonsuited, and the court of queen's bench sustained the nonsuit. The precise legal ground upon which the rights of the defendants were placed is not very readily ascertained from the short observations of Lord Campbell and Mr. Justice Patterson. It rests, however, upon the provisions and procedure of the English railway acts, and the construction given to the rights of parties under them by the English courts. It must be remembered that the legislature and the courts of Great Britain are not under the restraints of written constitutional provisions, such as are the guides of our tribunals in administering the law of eminent domain. It is held in England, that after notice given by the railway that they require and will take land, a complete contract—a parliament-

ary contract it has been called—exists between them and the owner of the land. The legislature, by the act of parliament, contract for the owner. They, on his behalf, offer the land to the company, and when the latter give notice that they intend to take it, the agreement is complete, and neither party can recede. The contract may be uncertain as to price, because that may be either what is demanded by the owner, or a value to be ascertained by voluntary or involuntary legal proceedings to be taken afterwards. But the act of parliament makes the agreement valid and effectual, although this uncertainty might affect the validity of an ordinary agreement. The relation of vendor and purchaser is established by the notice, and cannot afterwards be set aside, except by mutual consent, or by an ultimate failure of title or payment. These principles will be found in the English cases. See for example *Rex* v. *The Hungerford Market Company*, (4 *B. & A.* 327,) *Stone* v. *The Commercial Railway Company*, (4 *Myl. & Cr.* 122,) before Lord Cottenham, and the judgment of Baron Alderson in *Burkinshaw* v. *The Birmingham and Oxford Railway Company*, (4 *Eng. Law and Eq. Rep.* 489, 492.) In the case in 6 *Eng. Law and Eq. Rep.*, to which we were referred, the contract between the parties was complete by the steps required by the statute, and was existing at the time of the suit. There had been no default of such a character as to put an end to the contract on either side. If proceedings had been taken *in invitum* under the act, to ascertain the compensation to be made to the land owner, they would have had no effect upon the title, but only upon the question of price. Instead of these proceedings, a resort was had to arbitration, as a voluntary substitute; and if the arbitration was properly conducted, no doubt it was equally effectual. Either way, the contract was still in full force. The defendants had gone into possession by the express agreement of the plaintiff, and were in possession under a valid and existing contract which was in process of performance; they were not tenants at will, and the court would

not allow them to be ousted. It is very plain that this judgment of the court of queen's bench will not aid us in deciding the question of license which is presented by the case before us. The defendants have not alleged, and we are not called upon to say, whether they could have proved that they were in possession as purchasers, under a contract as valid and binding as that from which the rights of the defendants in *Doe* v. *The Leeds &c. Railway*, were derived.

The judgment of the learned referee was right, and must be affirmed with costs.

[KINGS GENERAL TERM, December 12, 1859. *Lott, Emott* and *Brown*, Justices.]